Filed 12/11/15  In re X.D. CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

<table>
<tr><td>In re X.D., et al., Persons Coming Under the Juvenile Court Law.</td><td>H042454<br>(Santa Clara County<br> Super. Ct. Nos. JD21801, JD21802 &<br> JD21803)</td></tr>
<tr><td>SANTA CLARA COUNTY DEPARTMENT OF FAMILY AND CHILDREN'S SERVICES,<br><br>     Plaintiff and Respondent,<br><br>       v.<br><br>L.F.,<br><br>     Defendant and Appellant.</td><td></td></tr>
</table>

This appeal is brought by L.F., the mother of three minor children who are dependents of the juvenile court.  Mother asserts the trial court erred in terminating her parental rights pursuant to Welfare and Institutions Code section 326.26.[1]

---

[1]  All further statutory references are to the Welfare and Institutions Code.

In April 2013, the juvenile court detained Mother's and Father's four children: Jesse D. who was 17 at the time,[3] X.D. (7), E.D. (3), and T.D. (10 months),[4] due to the parents' ongoing substance abuse and inability to meet the children's basic needs. All of the children were placed together in a foster home.

In May 2003, jurisdiction was continued, and the court ordered that the children were not to be separated without further order of the court.

An addendum report dated June 7, 2013 recommended that both parents receive family reunification services.

The foster home where the children were placed was an Emergency Satellite Home, which is considered a temporary placement. The foster parents were open to considering becoming a concurrent home.

In August 2013, the court sustained the petition and removed the children from their parents' custody. The Santa Clara County Department of Family and Children's Services (Department) was ordered to provide the parents with reunification services, including counseling, drug testing, substance abuse treatment, and 12-step meetings.

Jesse turned 18 in February 2014, and was admitted as a non-minor dependant of the juvenile court. Reunification services as to him were terminated, but he remained in the foster care home with his siblings.

Both parents received reunification services until the 12-month hearing in July 2014. The court terminated Father's services at that time, because he had not

---

[2] A portion of the statement of facts and case is taken from our opinion in L.F.'s previous appeal in *In re X.D. et al.; D.F.C.S. v. J.D. et al.* (Sept. 22, 2015, H041760) [nonpub. opn.] (*In re X.D. et al.*).)

[3] Jesse D. is not the subject of this appeal, because he is now an adult.

[4] The children's ages were at the time the juvenile court took jurisdiction.

completed any of his case plan. The court continued reunification services for Mother until the 18-month hearing.

In September 2014, at the 18-month review hearing, the court terminated reunification services for Mother. All four children remained in the foster home and were attached to their foster parents, but the foster parents did not wish to have the children on a long-term basis. The Department was looking for a concurrent home for the children, and began looking out-of-county.

On October 31, 2014, the Department filed a section 388 petition notifying the court that an adoptive home had been found for the children in Alameda County, and seeking authority to move the children to that home. The petition acknowledged that it was very important that the children maintain their relationship with Jesse, and that sibling visits would be set up as frequently as possible with him. The prospective adoptive family was willing to communicate with Jesse and facilitate ongoing visits with him.

Both Mother and Jesse opposed the prospective move of the children from their foster home to the new adoptive home in Alameda County. Jesse wanted to adopt his siblings, but could not be considered as a placement because he was a non minor dependent of the juvenile court. A contested hearing on the section 388 petition was set for November 21, 2014.

At the contested hearing, both parents opposed the Department's request to move the children out-of-county. They argued there was not a change in the children's circumstances, because the current foster parents were not asking for their removal. The parents also argued that it was not in the children's best interests to move out-of-county, because they were attached to their current foster parents and to Jesse, who was living with them at the time.

3

At the hearing, the children's social worker, Diep Nguyen testified about the case. She stated that the children have lived in the same foster home since their removal from their parents in April 2013. She also stated that the children were very bonded to one another and it was important that they remain together. Ms. Nguyen stated that Jesse wanted placement of the children with him, but was not in position to do that at the time, because he needed to finish high school and secure housing and employment.

Ms. Nguyen said she found a family in Alameda County that was willing to be an adoptive home for all of the minor children. She stated that at the time of the hearing, the children had been visiting the prospective adoptive family for over one month and she believed a transition into the home would be a smooth one. In addition, the prospective adoptive family was willing to transport the children to visits with their mother, and to continue visits with Jesse.

Ms. Nguyen testified that although the children were attached to their current foster parents, and that they would have to change schools and therapists if they moved, she believed it was in their best interests if they moved into a permanent home sooner rather than later. She believed this out-of-county placement was better for the children, because it ensured they would all be together.

Jesse also testified at the hearing. He said that he has lived with his siblings since they were born and that he could "basically be their dad." He did not want them moved out-of-county because he would not be able to see them on a daily basis as he did currently. Jesse anticipated that he would be finishing high school in January 2015, and he wanted to enroll in a welding program, get a part-time job, and obtain housing so that he could care for his siblings. He believed that it would take about one and one-half years to implement his plan.

Following Jesse's testimony, Ms. Nguyen said her recommendation regarding moving the children had not changed. She agreed that moving the children would be

4

difficult because they had become very attached to their caretakers. She also stated that because Jesse's plan would likely take two years to accomplish, it would not be in the children's best interests to wait for placement with him.

The children's trial counsel supported the Department's petition. The court found the Department had met its burden under section 388, and ordered that the children be placed in the out-of-county adoptive home.

The court ordered the Department to continue to facilitate meaningful contact between Jesse and the children, including transportation back and forth to Alameda. Both parents appealed the order, and this court affirmed in *In re X.D. et al., supra*, H041760 [nonpub. opn.].

The section 366.26 report dated January 23, 2015, recommended that the children be freed for adoption. They had been placed in their prospective adoptive home in Alameda County on November 29, 2014. All three children were doing well in their current foster placement. Although the initial transition had been difficult, the children had adapted and were on track developmentally. T.D. was having some difficulty at the end of visits with Mother and Jesse.

The report stated that the new foster father worked from home and the foster mother had taken several weeks off from work to care for the children. They had visited with the children for two months prior to the transition into their home.

The children continued to visit Mother twice a week and Jesse once a week. They also had weekly phone calls with Jesse. Initially, the children's foster parents tried to set up visits for Jesse on Friday afternoons in Alameda County, but his social worker decided it would be too overwhelming for him to travel on public transportation to Alameda County. The visits were then set up for Milpitas/Fremont. Jesse was given a bus pass and BART pass. Jesse continued to have the chance to visit the children on Friday, but none of the visits had happened.

5

Ms. Nguyen believed it would not be detrimental to the children to terminate Mother's parental rights. The children had been out of the care of both parents for two years. All three children had attached to their current foster parents. The children enjoyed visits with Mother, but transitioned back to the care of the foster parents easily at the end of visits. The foster parents had agreed to discuss continued contact with birth relatives and the previous foster family following finalization of adoption.

An addendum report was dated March 20, 2015, and stated that the children continued to be excited about visiting Mother and Jesse; however, both Jesse and Mother had said things to X.D. during the visits that gave him false hope that the children would return to live with Mother and Jesse. X.D. told the foster father that Jesse and Mother had been telling him they had a plan to get him back. E.D. told a social worker that they were going back to Mother and Jesse.

X.D. had started to have some behavior problems. He was rude and defiant and was showing aggressive behaviors. The foster parents said that the behavior problems happened following visits with Mother and Jesse. X.D. talked to the foster parents about it, telling them that he was confused about who he was going to live with, and that he loved both families. X.D. said that he felt like he had to "choose" a family. The foster father told X.D. that they would continue to see the birth family.

The report stated that Mother and Jesse were undermining the adoptive placement and making it difficult for the children to transition, because they were telling the children that the children would be coming back to live with them. The foster parents continued to be open to maintaining contact with the biological family, and in particular, they understood that Jesse was an important person to the children and had offered extra visits to him. He had not taken advantage of those offered visits. Jesse had not visited the children on his own without Mother also being present. Jesse lived in Gilroy and had difficulty getting to San Jose where visits were held.

6

The trial for the section 366.26 petition was held on May 9, 2015. Ms. Nguyen testified that while Mother was offered two visits a week, she was only attending one. None of the children were currently having difficulty transitioning after the visits. Ms. Nguyen stated that all three children were adoptable because they had no special needs, were all very smart, and were developmentally on track. The children and their foster parents appeared to her to be very loving and caring towards each other.

Ms. Nguyen said that she had spoken to the children about adoption. X.D. and E.D. understood what adoption was, and wanted to know when it was going to happen. She said that the children never asked to see Mother or Jesse. Ms. Nguyen stated that X.D.'s previous therapist had expressed that X.D. was feeling a lot of loss and was worried if he would see Mother again. She said that the current foster parents had told X.D. that he could still visit with Mother and Jesse after the adoption. The foster parents told Ms. Nguyen the same thing.

Ms. Nguyen testified that this was a difficult situation, but that in her opinion, adoption by the current foster parents was best for the children, because they were bonded with the parents and needed a sense of stability.

Mother testified about the relationship between the three younger children and Jesse. She said X.D. and E.D. always wanted to be with Jesse. She said T.D. loved Jesse as well. Mother said that when she was unable to care for the children before they were removed, Jesse stepped in to act as a parent to them. Mother said that Jesse and the children were very close and had never been separated.

The children's maternal aunt testified that she had gone to almost all of the visits and that the children were happy to see Mother and Jesse. She stated that the children did not want Mother and Jesse to leave at the end of the visits. She believed that if the children lose their relationship with Jesse, they would be devastated. Jesse testified that he did not believe that the children should be adopted. He said that he was like a parent

7

to X.D. and was almost the same with E.D.  Jesse said that he was also close to T.D.  He said that E.D. and T.D. called him "dad."  Jesse wished he could still see the children every day.

Jesse was looking for his own place to live, had a job and was almost finished with high school. He was planning to go to Evergreen College to learn automotive and engine repair.  Jesse said that he had not visited the children on his own since they moved to their current foster home because of school and because he would get back late.  For him, the issue was transportation and he said that it would take him five hours to get to the children for a visit.

At the conclusion of the trial, the court did not apply the beneficial relationship or sibling exception to adoption, and terminated parental rights.  Mother filed a timely notice of appeal.

### DISCUSSION

On appeal, Mother asserts the court erred in finding that the sibling exception to adoption under section 366.26, subdivision (c)(1)(B)(v) did not apply in this case.

Whenever the court finds, as it did here, "that it is likely the child will be adopted, the court shall terminate parental rights and order the child placed for adoption." (§ 366.26, subd. (c)(1).)  The circumstance that the court has terminated reunification services provides " 'a sufficient basis for termination of parental rights unless the court finds a compelling reason for determining that termination would be detrimental to the child due to one or more' of specified circumstances.  [Citation.]  The Legislature has thus determined that, where possible, adoption is the first choice." (*In re Celine R.* (2003) 31 Cal.4th 45, 53 (*Celine R.*).)

The "specified circumstances" detrimental to the child (mentioned by the court in *Celine R., supra*, 31 Cal.4th at p. 53) that may serve as compelling reasons for the court's electing not to terminate parental rights consist of six circumstances provided in section

8

366.26, subdivision (c)(1)(B). These circumstances are "actually, *exceptions* to the general rule that the court must choose adoption where possible." (*Celine R., supra*, at p. 53.) One such "*exceptional circumstance*[]" (*ibid.*) is where termination of parental rights would result in "substantial interference with a child's sibling relationship . . . ." (§ 366.26, subd. (c)(1)(B)(v).)

Under this sibling relationship statutory exception, "the court is directed first to determine whether terminating parental rights would substantially interfere with the sibling relationship by evaluating the nature and extent of the relationship, including whether the child and sibling were raised in the same house, shared significant common experiences or have existing close and strong bonds. [Citation.] If the court determines terminating parental rights would substantially interfere with the sibling relationship, the court is then directed to weigh the child's best interest in continuing that sibling relationship against the benefit the child would receive by the permanency of adoption. [Citation.] [¶] To show a substantial interference with a sibling relationship the parent must show the existence of a significant sibling relationship, the severance of which would be detrimental to the child." (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 951-952 (*L.Y.L.*), fn. omitted.) The possible detriment to be considered is that of the child being considered for adoption, not any detriment to his or her siblings. (*Celine R.,* supra, 31 Cal.4th at p. 54.) Even if the "substantial interference" standard is met, the court must still balance the benefits of continuing the sibling relationship against the benefit to the child provided by adoption. (*L.Y.L., supra*, at pp. 952-953.) It is a "rare" case in which the court will find that this exception to adoption applies. (*In re Valerie A.* (2007) 152 Cal.App.4th 987, 1014 (*Valerie A.*); see also *Celine R., supra*, at p. 53 [statute permits court, "in exceptional circumstances" to choose option other than the preferred one, adoption].) The party asserting the applicability of the sibling relationship exception bears the burden of proof (*In re Megan S.* (2002) 104 Cal.App.4th 247, 252), and a father

9

or mother whose parental rights are being threatened with termination has standing to assert the exception (*L.Y.L., supra*, at pp. 949-950).

As this court stated in *In re Bailey J.* (2010) 189 Cal.App.4th 1308 (*Bailey J.*), the decision as to whether the sibling exception to adoption applies in a particular case is a, " 'quintessentially' discretionary decision, which calls for the juvenile court to determine the *importance* of the relationship in terms of the detrimental impact that its severance can be expected to have on the child and to weigh that against the benefit to the child of adoption. (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 951.) Because this component of the juvenile court's decision is discretionary, the abuse of discretion standard of review applies." (*Id.* at p. 1315.)

In this case, the evidence presented supported the court's conclusion that the sibling exception did not apply to prevent adoption. The court considered the opportunity for the three younger children to be adopted together, and to be part of a stable, permanent family. Guardianship or long-term foster care could not ensure that the three younger children could remain together in an emotionally secure and stable home; rather, such a placement would increase the likelihood of disruption in the children's lives. Specifically, the court heard evidence that both Jesse and Mother were telling the children that they were trying to have the children live with them again. Adoption was the only option that would ensure permanency for the children.

Without question, the children had a close relationship with Jesse, and had spent their lives with him up until the time the juvenile court took jurisdiction in 2013. However, the time they did spend together was troubled by homelessness and parental neglect. Although Jesse wanted to be a parent to the children, he was a young adult and needed his own services to become independent. Because of his own situation, Jesse was having difficulty attending visits and maintaining a consistent relationship with the children.

10

Maintaining sibling relationships is extremely important.  (See *In re Erik P.* (2002) 104 Cal.App.4th 395, 404.). However, in the present case, maintaining a sibling relationship with Jesse did not outweigh the benefit the children would enjoy through the permanence of adoption in one family.  (See *L.Y.L.*, *supra*, 101 Cal.App.4th at pp. 951-952.)

We find that the court did not abuse its discretion when it found that the benefits to the children of adoption outweighed the detriment that could occur as a result of losing their legal relationship with Jesse.

## DISPOSITION

The order is affirmed.

11

_____
RUSHING, P.J.

WE CONCUR:


_____
MÁRQUEZ, J.



_____
GROVER, J.





*In re X.D. et al.; D.F.C.S. v. L.F.*
**H042454**